Good morning, Your Honors. Christy Hughes from Federal Defenders on behalf of Mr. Gonzalez-Melchor. I'd like to reserve two minutes for rebuttal. Mr. Gonzalez-Melchor had a plausible claim for voluntary departure. He satisfied the statutory requirements. Am I loud enough? Yeah, in the microphone. Okay. He satisfied the statutory requirements. Nobody wants to hear what you have to say. I'm sure. He satisfied the statutory requirements and it would not have been an abuse of discretion for an IJ to grant him voluntary departure given his equities. He had come to the United States ten years earlier. He had an established work history here. He had community ties here and he did not have any convictions or deportations. These equities are similar to those of the alien in Campos Granillo. There, Mr. Campos Granillo had lived here eight years, also illegally. He had at least six illegal prior crossings. And he had family members here who were Mexican citizens. Well, let me make sure I understand your analysis of the positive versus the negative factors. Because as I understand it, he did have some positives, no prior criminal conviction. He was gainfully employed and had joined a church. But he had a fair number of negative factors as well. Although if you count up all of his time in the United States, it did span over the course of ten years. But it was very intermittent because he kept going back and forth. And as I understand it, there was only about one year of continuous residency and the record is a little bit mixed. But if I recall correctly, when asked whether he had ties or family in the United States, his response was no. So that differs quite a bit from some of the cases that you cited in your briefs and the case that you mentioned today. Can you tell me where I've gone awry here in terms of understanding these mitigating factors? Sure. On the first part, the time in the United States, the record is a little bit ambiguous. I think if you look at what he said to the immigration judge and then you look at his declaration, he initially came in 1985. And I think he was going across the border. He would come here, I think, work, go back to Mexico, come back, because he has those six entries back and forth. But that was when he first came here, because he tells the immigration judge, I don't even remember the last time that I crossed back over. And he says in his declaration that he'd been living in north San Diego County for four years prior to his deportation. So I think it was a little bit more intermittent in the beginning. But right before he was deported, he had at least four years of continuous history here. And that's similar to the alien in Campos, Garnillo, where he had a total of eight years, but he also was going back and forth across the border quite frequently. On the point of the ---- Let me just ask you before I forget. Sure. When he came back here to work, did he go to work at the same place that he worked at earlier? In other words, when he came back, did he go back to the same employer? I understand. So was it continuous employment with the same employer? What the record states is that he was working in landscaping for a landscaper, Benjamin Anguiano. He'd been working with Mr. Anguiano since he came to the United States in 1985. So at the time of his deportation, he'd been working for him since he came here in 1985. And then he had also been working in construction. So I do believe the record demonstrates that it had been employment with the same employer while he was here. So an established work history. Regarding Your Honor's question about the family ties here, I believe what he said was that he didn't have any United States citizen family ties here. And that is correct. His wife was a Mexican citizen. His son at the time was a Mexican citizen. His wife was pregnant at the time he was deported. But when he was deported, she went back to Mexico with him. And so all of his family members are Mexican citizens. But, again, that's very similar to Campos Granillo where he had three Mexican citizen children and a Mexican spouse. And that was still family ties here. I also want to note in Campos Granillo, the alien there had actually paid a smuggler to smuggle in his family members. And that wasn't held against him in the voluntary departure analysis. Neither was his DUI. Well, it was balanced out with his favorable equities. And we don't have any of that here. In addition to Campos Granillo, the Arguellas-Campos case that the government focuses a bit on in its brief, I think, is instructive here. There, the alien had five voluntary departures and then illegal crossings back into the country, meaning that the illegal crossings that the IJ and the district court and the government here focused on, that Mr. Gonzalez-Melchor had, are not the significant negative equity that the government is arguing. In Arguellas-Campos, he continued to get a grant of voluntary departure, even though the opinion notes that he was twice granted voluntary departure within a matter of days and immediately returned. And yet IJs were still repeatedly granting him voluntary departure. So I think Arguellas-Campos shows. But at some time, at some point, they get fed up. They say, you know, we keep giving you voluntary departure, and the reason you're departing is you're not allowed to be here. Correct. So at some point, the IJ says, okay, and now, no longer am I going to give you voluntary departure. This is actually a genuine deportation or, depending on the statutory period, removal. And if you come back, you're sentenced, you're potentially vulnerable to a criminal conviction. I agree, Your Honor. And that was what the BIA said in Arguellas-Campos on number six, on voluntary departure number six. But for Mr. Gonzalez-Melchor, he had never before received voluntary departure. He had gone back on his own to Mexico and then crossed back in. So he's never been in immigration proceedings before? No. Okay. No. This was his first time. Here's a problem I have with this case, and it's a problem that may work to your client's advantage, so I want the government to make sure to listen to this one. It appears to me that the district judge applied the wrong standard. The district judge says this IJ seems particularly ill-disposed to this Petitioner. But that's not the standard. The question is whether there are grounds, and we're supposed to hypothesize a generic IJ, not the individual IJ who may or may not have a particular predisposition. What am I supposed to do with that? I'm supposed to send it back to the district judge to apply the right standard? I don't think so, Your Honor. I think you're absolutely correct. It's an objective standard. At this point, everything in the record that would – that this – everything is in the record that this Court would need to make the determination of prejudice and whether or not relief was plausible. There are no more facts for the district court to find. And we noted in our opening brief that this is now the second time that this same district court has addressed the question of prejudice and the second time that the district court has applied the wrong standard. The district judge is a little grumpy on this case, I think. He's very grumpy, yes. I don't think he likes the waiver of appeal issue in the first case. He made that quite clear. Yeah. So I think this Court can address prejudice here without having to remand, because there's no further facts for the district court to address. I'll reserve the remainder of my time. Thank you. Good morning, Your Honors, and may it please the Court. I'm Rebecca Cantor, appearing for the United States in this matter. I'll start right in by addressing your question first, Judge Blanchard. This is a case – there have been many cases that have applied the prejudice and the plausibility standard, and none of them have actually said whether it's an objective or subjective standard, which is essentially the issue that you're raising. Yeah. But under either standard, the United States prevails in this case. Clearly, as the district court judge found, if it is a subjective standard, the district court judge in this case knew all of the relevant facts he needed to know. He knew that the defendant had no criminal record except for an arrest for robbery. He knew the defendant's residency term. He knew about the family and the lack of any U.S. citizen family or legal permanent resident family. So he knew all that, and he said, I wouldn't grant you voluntary departure. So clearly, if that's the standard, we win. And the cases don't tell us. But under an objective standard, we still win, and that really is what the district court judge applied. He looked at all the factors. Let's talk about winning, though. If justice is done, you win. Yes, Your Honor. Well, that will You don't look upon these cases as winning or losing. Yes, Your Honor. Or building a record. Well, under an objective standard, the United States would prevail in its argument that the collateral attack should not have been successful. And it shouldn't have been successful because when the court weighs all the factors and it is de novo review in front of this court to weigh those factors, the defendant I'm sorry, the appellant cannot show a plausible grounds for relief. I think the most important thing to focus on at this juncture is something that Arrietta teaches us, which is that although Krampus-Grandio identifies numerous positive and negative factors that a court needs to balance, Arrietta says that the most important is family circumstances. And that's where the hardship really comes in. And going back to what Your Honor said about a government with a heart, it makes sense because that's what really tugs at the heartstrings are the situations where family unity, and that's the expression used in the case law, is disrupted by the deportation. So in this, in nearly all the cases, and Krampus-Grandio is a slight exception to that, but in every other case, what we see is an abundance of family ties to the United States, a U.S. citizen wife, U.S. citizen children. And you can see how family unity is disrupted. That's not the case with this set of facts. The defendant had, at the time of his deportation, a wife who was a Mexican citizen, approximately a two-year-old son named Kevin who was also a Mexican citizen, and his wife was pregnant, and we know that she later gave birth in Mexico. So he didn't have siblings, parents, or immediate family, a wife or children, in the case of this case. And we know that the case law is disrupted by the deportation of the U.S. citizen by going back to Mexico. Now, you're a little handicapped, and in some ways maybe we are, too. The question here, if we have what you're calling the objective standard, is what's plausible to think might have happened, not even likely, but plausible, might have And my understanding from reading a lot of cases over the years is that there's a lot of variation among the IJs as to whether or not they grant voluntary departure. And I wouldn't be at all surprised if you come before some IJs, they would grant voluntary departure in this case. Now, if that's right, and I'm not sure that it's right, but that's kind of my sense of the pattern of how IJs have behaved. I've been reading these cases for a long time. Does that mean if we're doing an objective case, an objective standard, that it's plausible that he could have gotten voluntary departure? No, Your Honor. I think at best what that supports is that it is possible. But a mere possibility is not enough to satisfy the plausibility standard. I disagreed in my brief that statistics matter for these purposes, and I think the case law supports that you can't rely just on statistics. But even if you consider that counsel cited the statistics, which is that voluntary departure was only granted in about 10 percent of cases, this is not suggestive of something that was likely, let alone it was possible. But it's not plausible. It's not likely. And going back to – I agree. The immigration judges, when the courts look at the universe of case law, are all over the place. And it's a difficult standard that you're applying here. It's a continuum with on the one side the type of alien who has very extensive family ties and no criminal record, and on the other extreme, the type with no family ties and a large criminal record. We're somewhere in between. But I come back to what I think is a resonating theme in both the BIA opinions, reviewing an immigration judge's exercise of discretion, sometimes overturning that exercise of discretion, as well as the Ninth Circuit cases. And an overarching theme is the family ties, which are lacking in this case, and also the continuity of residency, which is another important one. In this case, as a result of Your Honor's questions, I went back and checked the record. And what the alien told the immigration judge in this case is that he'd been here for one prior year continuously before his deportation, but that in the last seven years, he'd been here half and half. And that's on page 24 of the record. That's not the level of continuous residency that is evident in Frias Flores, in even all the other cases that the Court has to look at. I noticed in your brief, fairly early on, that you recite a lot of his criminal history after the decision by the IJ whether to deport him. Right. Is that relevant to our decision? Only in the most limited sense, Your Honor. It is not relevant to determining the plausibility that the immigration judge would have granted relief. Definitely not. The reason it is relevant is because this defendant did have a later removal. He had an expedited removal in 06. And this informs what might happen on remand. So, obviously, I don't think this case needs to be remanded, because it is my contention that the district court judge did not err in finding relief wasn't plausible. But if the court disagreed with me and felt the need to remand it, there's no counsel, and I agree, there's no more need for a development of the record here. The record is as fully developed as it will get. So the only thing that could happen if this Court decided that plausibility was, that it was plausible, it would go back to the district court on remand for an evaluation of whether the case would proceed on the other deportation that the defendant had. So that's the only reason that that is potentially a relevant factor. It doesn't inform what was plausible, and it doesn't factor into as a negative  But the other deportation was never an issue with regard to this particular 1326 conviction, even though the government had originally pled both because the government relied and presented evidence only with regard to this particular deportation. Is that right? Exactly. Your Honest would have to vacate the conviction on remand, and the court would then have to start over with the trial, because the conviction was based on the this immigration judge's deportation. I want to make one final point. Would you have to start over with the trial, or would you have to reindict? You wouldn't – well, I don't think you would reindict. The district court judge actually may have analyzed this himself and determined that a collateral attack attacks a specific deportation. They're framed as motions to dismiss the indictment, but that's a little bit of a misnomer because someone could have multiple deportations which could independently support an indictment. Well, the district judge said he'd let you use the other deportation. Is there a problem with that? Well – I know it's beyond the scope of this particular appeal, but – I agree it's beyond the scope, but I would think that there's no problem as long as defendant is presented the opportunity to attack that deportation if he so chooses as well. He would have to get the due process on that. And I want to make one final point addressing, Your Honor, Judge Newman, your questions, which are I would recharacterize some of what you describe as positive facts, and I actually think that they're more properly put on the spectrum as neutral facts. So, for example, the lack of criminal convictions. That is really a neutral fact. It means there's nothing to hold against him, but it's expected that one follows the law. So it doesn't – it doesn't emerge to his benefit. And the fact that he was working in the United States, again, is a bit of a double-edged sword. He wasn't working legally in the United States, and several of the cases have suggested that, like Arguelles Campos says, it would be a little ironic for that to be a positive factor to continue to break the law. So I would say it's a good thing he works. It's not a good thing he does something illegal. So it becomes neutral. If we didn't have all these folks here working illegally, the whole economy would collapse. Which is why, Your Honor, at the end of the day, one can understand the situation the defendant found himself in, and I take it's neutralized. It's not a negative, but it's not a positive. It's just a mere neutral fact of him being here in the United States. And what the Court's really trying to look for are really positive facts. The family ties, the family unity, the things that outweigh the fact that the immigration judge has to enforce the law, the immigration law. That is his charge. And so he's going to evaluate these six illegal crossings differently than perhaps this Court would or district court would in evaluating equities in a sentencing context. And there's nothing to balance that out in this case. And as such, relief was not plausible. If there's no further questions, I'll submit. Thank you, Your Honor. Thank you, Your Honors. Well, Your Honors, I want to start there. Government counsel referred to the overarching theme of family ties and that all of these cases have a number of U.S. citizen family members here. And what's important is that the reason that most of these cases have a number of U.S. citizen family members here is because the aliens in those cases generally have very bad criminal histories that need to be balanced out in the equities determination. Here we don't have any of those egregious criminal convictions. We don't have a lot of negative factors so that Mr. Gonzales-Melchor needed three citizen children to be living here. That's why we have kind of an even balance here when you look at the equities. Help me understand as a practical matter what would happen if we were to conclude that he has a plausible case for voluntary departure for the first deportation. Then what? The government says, oh, well, we're just going to start over again and have the prior deportation be the second of the two deportations. And at that instance, all this subsequent bad criminal history comes in. Because at the time of the first deportation, all he had was an arrest. Correct. And now he's got quite a few convictions. So tell me what's going to happen here as a practical matter. Well, the conviction would have to be vacated because, as Your Honor noted, this was the deportation that the government proved at the trial. And so I think at that point if the government then wants to reindict and proceed with the 2006 expedited removal, they can. I don't know if they're going to choose to do that. But I think there's also an issue, and the district court noted this, it's a little bit like a sufficiency challenge where if you decide to go forward with two witnesses and then on appeal that conviction is vacated, you don't get to come back and put in your third witness. And the government did go forward on the 1995 deportation. I know they said, oh, well, we didn't have a lot of time to brief the 2006 expedited removal, but the fact is they didn't brief it. They didn't ask for a continuance. And they never asked the district court for an explicit ruling on the 2006 expedited removal. The case went forward. No one really addressed it. And then back when the case came back after appeal, the government said, oh, well, there's another removal that we'd like to address. And the district court said, oh, well, we'll get to that when we get to it, I guess. But there's a double jeopardy problem. I mean, the crime would be reentering after having been removed. Is it a sufficiently different crime if we're talking about two different removals? Probably we are. Yeah. Okay. I would argue no. I would bet you would. One more point just on the objective standard, Your Honor. In Ubaldo-Figueroa, this Court said that we don't look at whether the alien would have had to actually demonstrate relief. And so if we're going to look at whether the result would have been different before this particular I.J., that really looks at whether or not you actually would have been granted relief. And that standard has already been rejected in Ubaldo-Figueroa. Thank you. Thank you. This matter is submitted.
judges: Pregerson, Fletcher, Nguyen